**IN THE UNITED DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LINDA HOLLAND, WILLIAM HOLLAND, CHEALESA PARSHA individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZEROED-IN TECHNOLOGIES, LLC,<br><br>Defendant. | Case No. ________________<br><br>**CLASS REPRESENTATION**<br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Linda Holland, William Holland, and Chealesa Parsha ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against the Defendant Zeroed-In Technologies, LLC ("Zeroed-In" or "Defendant"). Plaintiffs bring this action by and through their attorneys, and allege, based upon personal knowledge as to their own actions, and based upon information and belief and reasonable investigation by their counsel as to all other matters, as follows.

## I. INTRODUCTION

1. Zeroed-In is a business technologies company that provides workforce analytics software to its clients, among them Dollar Tree and Family Dollar.

2. As part of its operations, Zeroed-In collects, maintains, and stores highly sensitive personal information belonging to its customers' current, former, and prospective employees, including, but not limited to: full names, Social Security numbers, and dates of birth ("personally identifying information" or "PII").

3. On August 8, 2023, Zeroed-In discovered suspicious activity on its servers and launched an investigation, which determined that between August 7, 2023 and August 8, 2023,

unauthorized actors had compromised Zeroed-In's security system and accessed files and servers containing the PII of its customers' current, former, and prospective employees. Zeroed-In began notifying its customers of this event after its investigation concluded on August 31, 2023.

4. On November 27, 2023, Zeroed-In began dispatching a notice of data breach to affected individuals.

5. Because Defendant stored and handled highly sensitive PII, it had a duty and obligation to safeguard this information and prevent unauthorized third parties from accessing it.

6. Defendant failed to fulfill this obligation as unauthorized cybercriminals breached Defendant's information systems and databases, and stole vast quantities of PII belonging to its customers' current, former, and prospective employees, including Plaintiffs and Class members. This breach and the successful exfiltration of PII were direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

7. The data breach occurred because Defendant failed to implement reasonable security protections to safeguard its information systems and databases. Further, Defendant failed to inform the public that its data security practices were deficient and inadequate.

8. Defendant's subsequent handling of the breach was also deficient: Defendant failed to inform Plaintiffs and Class members in a timely manner that their PII was stolen, delaying sending notice until 111 days—more than 3 months—after the breach.

9. As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiffs and Class members suffered injuries as a result of Defendant's conduct including, but not limited to:

- Lost or diminished value of their PII;
- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

- Lost opportunity costs associated with attempting to mitigate consequences of the data breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Time needed to change usernames and passwords on their accounts;

- Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the data breach;

- Charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their PII.

10. Accordingly, Plaintiffs bring this action on behalf of all those similarly situated to seek relief for Defendant's failure to reasonably safeguard Plaintiffs' and Class members' PII; Defendant's failure to reasonably provide timely notification to Plaintiffs and Class members that their PII had been compromised; and for Defendant's failure to inform Plaintiffs and Class members concerning the status, safety, location, access, and protection of their PII.

## II. PARTIES

**Plaintiff Linda Holland**

11. Plaintiff Linda Holland is a resident and citizen of West Columbia, South Carolina. She was a former employee at Dollar Tree, one of Defendant's customers. Plaintiff Linda Holland received Defendant's Data breach Notice.

**Plaintiff William Holland**

12. Plaintiff William Holland is a resident and citizen of West Columbia, South Carolina. She was a former employee at Dollar Tree, one of Defendant's customers. Plaintiff William Holland received Defendant's Data breach Notice.

**Plaintiff Chealesa Parsha**

13. Plaintiff Chealesa Parsha is a resident and citizen of Rosston, Arkansas. She was a former employee at Dollar Tree, one of Defendant's customers. Plaintiff Chealesa Parsha received Defendant's Data breach Notice.

**Defendant Zeroed-In Technologies, LLC**

14. The Defendant is a Florida corporation with its principal place of business located at 780 Elkridge Landing Road, Suite 280, Linthicum, Maryland 21090.[1] Defendant is a technologies company that provides workplace analytics services to major commercial customers throughout the country.

## III. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

16. This Court has personal jurisdiction over Zeroed-In because it is headquartered in Linthicum, Maryland, and because it conducts substantial business in Maryland and this District, and the acts and omissions that give rise to Plaintiff's claims occurred in and emanated from this District.

---

[1] *See Zeroed-In*, Zeroed-In, available at: https://www.zeroedin.com/ (last accessed Dec. 13, 2023).

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Zeroed-In Technologies – Background

18. Defendant Zeroed-In Technologies provides workplace analytics software to major commercial clients. Among its major clients was the dollar store franchise Dollar Tree.[2]

19. As part of its normal business operations, it collects, maintains, and stores the highly sensitive PII provided by its customers' current, former, and prospective employees, including but not limited to: full names, Social Security numbers, and dates of birth.

20. On information and belief, Zeroed-In had failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the PII of Plaintiffs and Class members.

21. Plaintiffs and Class members, made their PII available to Zeroed-In's customers with the reasonable expectation that Zeroed-In would keep their sensitive and personal information confidential and secure from illegal and unauthorized access. Further, Plaintiffs and Class members reasonably expected that, in the event of any unauthorized access, Zeroed-In would provide them with prompt and accurate notice.

22. Those expectations were objectively reasonable and based on an obligation imposed on Zeroed-In by statute, regulations, industrial custom, and standards of general due care.

---

[2] Ionut Arghire, *Dollar Tree Impacted by ZeroedIn Data Breach Affecting 2 Million Individuals*. SecurityWeek (November 30, 2023), available at https://www.securityweek.com/dollar-tree-impacted-by-zeroedin-data-breach-affecting-2-million-individuals/.

23. Unfortunately for Plaintiffs and Class members, Zeroed-In failed to carry out its duty to safeguard sensitive PII and provide adequate data security. As a result, it failed to protect Plaintiffs and Class members from having their PII accessed and stolen during the Data Breach.

## B. The Data Breach

24. According to Zeroed-In, cybercriminals breached and accessed several of its employees' emails between August 7, 2023 and August 8, 2023.[3]

25. Zeroed-In does not explain when or how it discovered the breach, only advising that it completed an investigation on August 31, 2023. This investigation determined that cybercriminals had accessed data systems that contained names, dates of birth, and Social Security numbers belonging to Dollar Tree's current, former, and prospective employees.[4]

26. On November 27, 2023, Zeroed-In sent notice to all individuals affected by this data security incident. In total, Zeroed-In waited 111 days after detecting the data breach, and 88 days after the investigation concluded, to notify Plaintiffs and Class members that their PII was compromised.[5]

27. Zeroed-In estimates that at least 1,977,486 individuals nationwide have been affected by the data breach.[6]

## C. Zeroed-In's Many Failures Both Prior to and Following the Breach

28. Defendant collects and maintains vast quantities of PII belonging to Plaintiffs and Class members as part of its normal operations. The data breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

---

[3] Ex. 1.
[4] *Ibid.*
[5] *Ibid.*
[6] https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last accessed December 9, 2023).

29. First, Defendant failed to implement reasonable security protections to safeguard its information systems and databases.

30. Second, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiffs and Class members been aware that Defendant did not have adequate safeguards in place to protect such sensitive PII, they would have never provided such information to Defendant's customers.

31. In addition to the failures that lead to the successful breach, Defendant's failings in handling the breach and responding to the incident exacerbated the resulting harm to Plaintiffs and the Class.

32. Defendant failed to timely inform Plaintiffs and Class members that their information was stolen, waiting until 111 days after the data breach to finally provide notice to affected individuals. This delay virtually ensured that the cybercriminals who stole PII could monetize, misuse and/or disseminate that PII before Plaintiffs and Class members could take affirmative steps to protect themselves. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

33. Additionally, Defendant's attempt to ameliorate the effects of this data breach with 1 year of complimentary credit monitoring is inadequate. Plaintiffs' and Class members' PII was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their PII. And this can, and in some circumstances already has, caused irreparable harm to their personal, financial, reputational, and future well-being.

34. In short, Defendant's myriad failures, including the failure to timely notify Plaintiffs and Class members that their personal information had been stolen due to Defendant's security failures, allowed unauthorized individuals to access, misappropriate, and misuse Plaintiffs' and Class members' PII for 111 days before Defendant finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

## D. Data Breaches Pose Significant Threats

35. Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

36. In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[7]

37. Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 1,862 in 2021, to 2022's total of 1,802.[8] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 422 million in 2022, which is an increase of nearly 50%.[9]

---

[7] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (January 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report.

[8] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2022*, Statista, available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last accessed last accessed August 15, 2023).

[9] *Id.*




38. This stolen PII is then routinely traded on dark web black markets as s simple commodity, with social security numbers being so ubiquitous to be sold at as little as $2.99 apiece and passports retailing for as little as $15 apiece.[10]

39. In addition, the severity of the consequences of a compromised Social Security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory elements can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

[10] *What is your identity worth on the dark web?* Cybernews (September 28, 2021), available at: https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.

> illegally using your Social Security number and assuming your identity can cause a lot of problems.[11]

This is exacerbated by the fact that the problems arising from a compromised Social Security number are exceedingly difficult to resolve. A victim cannot proactively change his or her Social Security number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[12]

40. Given the nature of Defendant's Data Breach, as well as the length of the time Defendant's networks were breached and the long delay in notification to the Class, it is foreseeable that the compromised PII has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class members' PII can easily obtain Plaintiffs' and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

41. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[13] The

---

[11] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[12] *Id.*

[13] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18,

information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42. To date, Defendant has offered its consumers only 1 year of identity theft monitoring services. The offered services are inadequate to protect Plaintiffs and the Class from the threats they will face for years to come, particularly in light of the PII at issue here.

43. Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class members from misappropriation. As a result, the injuries to Plaintiffs and the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for its current and former patients.

**E. <u>Defendant Had a Duty and Obligation to Protect PII</u>**

44. Defendant has an obligation to protect the PII belonging to Plaintiffs and Class members. First, this obligation was mandated by government regulations and state laws, including FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII. Plaintiffs and Class members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

**1. FTC Act Requirements and Violations**

45. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has

---

2021), available at https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

46. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[14] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[15] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

47. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

---

[14] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.
[15] *Id.*
[16] *Id.*

48. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

50. Defendant was fully aware of its obligation to protect the PII of its current and former patients, including Plaintiffs and the Class or it should have been.

51. Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the PII from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiffs and Class members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiffs' and Class members' PII.

**2. Industry Standards and Noncompliance**

52. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

53. Some industry best practices that should be implemented by businesses dealing with sensitive PHI like Defendant include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees

can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

54. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

55. Defendant should have also followed the minimum standards of any one of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

56. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

## F. Plaintiffs and the Class Suffered Harm Resulting from the Data Breach

57. Like any data hack, the Data Breach presents major problems for all affected.[17]

58. The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account,

[17] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[18]

59. The ramifications of Defendant's failure to properly secure Plaintiffs' and Class members' PII are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

60. According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

61. Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

62. Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[19] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[20]

63. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by

---

[18] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed March 11, 2023).

[19] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.

[20] *Id.*

cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' PII will do so at a later date or re-sell it.

64. Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[21] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[22]

65. In response to the Data Breach, Defendant offered to provide certain individuals whose PII was exposed in the Data Breach with 1 year of complimentary credit monitoring However, this limited period is much shorter than what is necessary to protect against the lifelong risk of harm imposed on Plaintiffs and Class members by Defendant's failures.

66. Moreover, the credit monitoring offered by Defendant is fundamentally inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive PII.

67. Here, due to the Breach, Plaintiffs and Class members have been exposed to injuries that include, but are not limited to:

a. Theft of PII;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the PII stolen during the Data Breach;

c. Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d. Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges,

[21] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds (last accessed August 14, 2023).

[22] *Id.*

cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

e. The imminent and impending injury resulting from potential fraud and identity theft posed because their PII is exposed for theft and sale on the dark web; and

f. The loss of Plaintiffs' and Class members' privacy.

68. Plaintiffs and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII being accessed by cybercriminals, risks that will not abate within a mere year. The unauthorized access of Plaintiffs' and Class members' PII, especially their Social Security numbers, puts Plaintiffs and the Class at risk of identity theft indefinitely, and well beyond the limited period of credit monitoring that Defendant offered victims of the Breach.

69. As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure PII, Plaintiffs and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft.

70. Plaintiffs retain an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose PII was accessed in the Data Breach.

## G. PLAINTIFFS' EXPERIENCES

**Plaintiff Linda Holland's Experience**

71. Plaintiff Linda Holland was a former employee at Dollar Tree, which was one of Zeroed-In's customers.

72. Plaintiff Linda Holland received Defendant's data breach notice. The notice informed Plaintiff Linda Holland that her PII had been improperly accessed and obtained by third parties.

73. After the breach, Plaintiff Linda Holland experienced a dramatic uptick in the number of spam calls and emails she received on a daily basis.

74. As a result of the Data Breach and the spam calls, Plaintiff Linda Holland has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Linda Holland has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

75. As a result of the Data Breach, Plaintiff Linda Holland suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her private information for purposes of identity theft and fraud. Plaintiff Linda Holland is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

76. Plaintiff Linda Holland suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from her; (b) violation of her privacy rights;

and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

77. As a result of the Data Breach, Plaintiff Linda Holland anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, Plaintiff Linda Holland is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**Plaintiff William Holland' Experience**

78. Plaintiff William Holland was a former employee at Dollar Tree, which was one of Zeroed-In's customers.

79. Plaintiff William Holland received Defendant's data breach notice. The notice informed Plaintiff William Holland that his PII had been improperly accessed and obtained by third parties.

80. After the breach, Plaintiff William Holland experienced a dramatic uptick in the number of spam calls and emails he received on a daily basis.

81. As a result of the Data Breach and the spam calls, Plaintiff William Holland has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff William Holland has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

82. As a result of the Data Breach, Plaintiff William Holland suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling,

and using his private information for purposes of identity theft and fraud. Plaintiff William Holland is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

83. Plaintiff William Holland suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from her; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

84. As a result of the Data Breach, Plaintiff William Holland anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, Plaintiff William Holland is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**Plaintiff Chealesa Parsha's Experience**

85. Plaintiff Chealesa Parsha was a former employee at Dollar Tree, which was one of Zeroed-In's customers.

86. Plaintiff Chealesa Parsha received Defendant's data breach notice. The notice informed Plaintiff Chealesa Parsha that her PII had been improperly accessed and obtained by third parties.

87. After the breach, Plaintiff Chealesa Parsha experienced a dramatic uptick in the number of spam calls and emails she received on a daily basis. She also discovered that she had been locked out of her credit bureau accounts when she went to check her credit report for fraudulent activity. She suspects that unauthorized actors have locked her out of her accounts using information gathered in the breach.

88. As a result of the Data Breach, the spam calls, and being locked out of her credit bureau accounts, Plaintiff Chealesa Parsha has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Chealesa Parsha has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

89. As a result of the Data Breach, Plaintiff Chealesa Parsha suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud. Plaintiff Chealesa Parsha is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

90. Plaintiff Chealesa Parsha suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

91. As a result of the Data Breach, Plaintiff Chealesa Parsha anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, Plaintiff Chealesa Parsha is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS REPRESENTATION ALLEGATIONS

92. Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose PII was accessed in the Data Breach (the "**National Class**").

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

93. Plaintiffs Linda Holland and William Holland also bring this action on behalf of the following subclass:

> All persons who are residents of the State of South Carolina whose PII was accessed in the Data Breach (the "**South Carolina Subclass**").

Excluded from the Subclass are Defendant, its executives and officers, and the Judge(s) assigned to this case.

94. Plaintiffs Chealesa Parsha brings this action on behalf of the following subclass:

> All persons who are residents of the State of Arkansas whose PII was accessed in the Data Breach (the "**Arkansas Subclass**").

95. <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable with the number of affected individuals estimated to be close to 2 million individuals. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

96. <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over

the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. When Defendant learned of the Data Breach;

b. Whether hackers obtained Class members' PII via the Data Breach;

c. Whether Defendant's response to the Data Breach was adequate;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations, industry standards, and/or its own promises and representations;

f. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

g. Whether Defendant owed a duty to Class members to safeguard their PII;

h. Whether Defendant breached its duty to Class members to safeguard their PII;

i. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

j. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

k. Whether Defendant's conduct violated the FTCA;

l. Whether Defendant's conduct was negligent;

m. Whether Defendant's conduct was *per se* negligent;

n. Whether Defendant was unjustly enriched;

o. What damages Plaintiffs and Class members suffered as a result of Defendant's misconduct;

p. Whether Plaintiffs and Class members are entitled to actual and/or statutory damages; and

q. Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

97. Typicality: All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the Class had their PII compromised in the Data Breach. Plaintiffs' claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

98. Adequacy: Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Classes they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are antagonistic to the interests of other members of the Class.

99. Superiority: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is the most superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (By Plaintiffs on behalf of the Class)

100. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

101. Defendant owes a duty of care to protect the PII belonging to Plaintiffs and Class members. Defendant also owes several specific duties including, but not limited to, the duty:

a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in its possession;

b. to protect patients' PII using reasonable and adequate security procedures and systems compliant with industry standards;

c. to have procedures in place to detect the loss or unauthorized dissemination of PII in its possession;

d. to employ reasonable security measures and otherwise protect the PII of Plaintiffs and Class members pursuant to the FTCA;

e. to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. to notify promptly Plaintiffs and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

102. Defendant also owes this duty because Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 requires Defendant to use reasonable measures to protect confidential data.

103. Defendant also owes this duty because industry standards mandate that Defendant protect confidential private information in its possession.

104. Defendant also owes this duty because it had a special relationship with Plaintiffs and Class members. Plaintiffs and Class members entrusted their PII to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the PII stored on them from attack.

105. Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the PII belonging to Plaintiffs and the Class. This duty exists to allow Plaintiffs and the Class the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII.

106. Defendant breached its duties to Plaintiffs and the Class by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard the PII belonging to Plaintiffs and Class members.

107. Defendant also breached the duties it owed to Plaintiffs and the Class by failing to timely and accurately disclose to Plaintiffs and Class members that their PII had been improperly acquired and/or accessed.

108. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class were damaged. These damages include, and are not limited to:

- Lost or diminished value of their PII;
- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;
- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;
- Permanent increased risk of identity theft.

109. Plaintiffs and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

110. In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiffs and Class members.

111. Plaintiffs are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiffs on behalf of the Class)**

112. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

113. Section 5 of the FTCA imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the PII of Plaintiffs and Class members.

114. Defendant violated the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiffs' and Class members' PII.

115. Defendant's failure to comply with the FTCA constitutes negligence *per se*.

116. Plaintiffs and Class members are within the class of persons that the FTCA is intended to protect.

117. It was reasonably foreseeable that the failure to protect and secure Plaintiffs' and Class members' PII in compliance with applicable laws and industry standards would result in that Information being accessed and stolen by unauthorized actors.

118. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their PII, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

119. Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
**(By Plaintiffs on behalf of the Class)**

120. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

121. Plaintiffs and the Class provided Defendant with their PII.

122. By providing their PII, and upon Defendant's acceptance of this information, Plaintiffs and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

123. The implied contracts between Defendant and Plaintiffs and Class members obligated Defendant to take reasonable steps to secure, protect, safeguard, and keep confidential

Plaintiffs' and Class members' PII. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. Defendant expressly adopted and assented to these terms in its public statements, representations and promises as described above.

124. The implied contracts for data security also obligated Defendant to provide Plaintiffs and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their PII.

125. Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the PII belonging to Plaintiffs and Class members; allowing unauthorized persons to access Plaintiffs' and Class members' PII; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiffs and Class members, as alleged above.

126. As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiffs and the Class have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of PII, and are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiffs on behalf of the Class)**

127. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

128. This count is brought in the alternative to Count III.

129. Plaintiffs and the Class have a legal and equitable interest in their PII that was collected and maintained by Defendant.

130. Defendant was benefitted by the conferral upon it of Plaintiffs' and Class members' PII and by its ability to retain and use that information. Defendant understood that it was in fact so benefitted.

131. Defendant also understood and appreciated that Plaintiffs' and Class members' PII was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

132. But for Defendant's willingness and commitment to maintain its privacy and confidentiality, Plaintiffs and Class members would not have provided or authorized their PII to be provided to Defendant, and Defendant would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining patients, gaining the reputational advantages conferred upon it by Plaintiffs and Class members, collecting excessive advertising and sales revenues as described herein, monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures, staffing, and expertise raising investment capital as described herein, and realizing excessive profits.

133. As a result of Defendant's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiffs, the Class, and the public relating to the nature and scope of the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the PII belonging to Plaintiffs and Class members without having adequate data security measures; and its other conduct facilitating the theft of that PII), Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class members.

134. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion.

135. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and the Class in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

136. The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain the benefit.

137. Defendant is therefore liable to Plaintiffs and Class members for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the PII that was accessed and exfiltrated in the Data Breach and the profits Defendant receives from the use and sale of that information.

138. Plaintiffs and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

139. Plaintiffs and Class members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT V
## VIOLATION OF SOUTH CAROLINA DATA BREACH NOTIFICATION LAW
**S.C. Code Ann. § 39-1-90(A), *et seq.***
**(On behalf of Plaintiffs Linda and William Holland and the South Carolina Subclass)**

140. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

141. This count is brought on behalf of the South Carolina Subclass.

142. S.C. Code Ann. § 39-1-90(B) mandates that:

> "A person conducting business in this State and maintaining computerized data or other data that includes personal identifying information that the person does not own shall notify the owner or licensee of the information of a breach of the security of the data immediately following discovery, if the personal identifying information was, or is reasonably believed to have been, acquired by an unauthorized person.

143. S.C. Code Ann. § 39-1-90(G) mandates provides that any resident of South Carolina who is injured by a defendant's "willful and knowing" violation of this section may bring an action for damages and an injunction.

144. Defendant *knew* that PII belonging to members of the South Carolina Subclass were compromised at the conclusion of its investigation on August 31, 2023. However, Defendant did not begin notifying members of the South Carolina Subclass until November 27, 2023, which was 88 days after it *knew* that the PII had been compromised. With this delay, Defendant committed a willful and knowing violation of S.C. Code Ann. § 39-1-90.

145. And Defendant's delay virtually ensured that cybercriminals who stole PII could monetize, misuse and/or disseminate that PII before members of the South Carolina Subclass could take affirmative steps to protect themselves. As a result, they will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

146. Plaintiffs Linda and William Holland and the members of the South Carolina Subclass seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**COUNT VI**
**INTRUSION UPON SECLUSION**
**(By Plaintiffs on behalf of the Class)**

147. Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 99 as if fully set forth herein.

148. Plaintiffs and Class members had a reasonable expectation of privacy in the PII that Defendant possessed and/or continues to possess.

149. By failing to keep Plaintiffs' and Class members' PII safe, and by misusing and/or disclosing their PII to unauthorized parties for unauthorized use, Defendant invaded Plaintiffs' and Class members' privacy by:

a. Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

b. Publicizing private facts about Plaintiffs and Class members, which is highly offensive to a reasonable person.

150. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' position would consider Defendant's actions highly offensive.

151. Defendant invaded Plaintiffs' and Class members' right to privacy and intruded into Plaintiffs' and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

152. As a proximate result of such misuse and disclosures, Plaintiffs' and Class members' reasonable expectation of privacy in their PII was unduly frustrated and thwarted.

Defendant's conduct amounted to a serious invasion of Plaintiffs' and Class members' protected privacy interests.

153. In failing to protect Plaintiffs' and Class members' PII, and in misusing and/or disclosing their PII, Defendant has acted with malice and oppression and in conscious disregard of Plaintiffs' and Class members rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of patients. Plaintiffs, therefore, seek an award of damages, including punitive damages, on behalf of Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B. That Plaintiffs be granted the declaratory relief sought herein;

C. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

D. That the Court award Plaintiffs and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E. That the Court award Plaintiffs and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate;

H. That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I. That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the putative Class and Subclasses, demand trial by jury on all issues so triable.

Date: December 15, 2023

Respectfully Submitted,

/s/ Thomas A. Pacheco
Thomas A. Pacheco (Bar No. 1712140091)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
900 W Morgan Street
Raleigh, NC 27603
T: (212) 946-9305
tpacheco@milberg.com

Daniel O. Herrera (*pro hac vice* anticipated)
Nickolas J. Hagman (*pro hac vice* anticipated)
Alex Lee (*pro hac vice* anticipated)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
alee@caffertyclobes.com

*Attorneys for Plaintiffs and the Proposed Classes*

# EXHIBIT 1

We represent Zeroed-In Technologies, LLC ("Zeroed-In"), located at 8595 College Parkway, Suite 350, Fort Myers, FL 33919, and are writing on behalf of the below entities to notify your Office of an incident that may affect the security of certain information relating Maine residents. Zeroed-In is a data and technology consulting firm that provides workforce analytical services to its customers, including the following entities ("Customers") and includes the total number of impacted individuals in parenthesis below:

- Dollar Tree & Family Dollar, 500 Volvo Parkway, Chesapeake, VA 23320, (7,034)

The investigation into this matter is ongoing, and this notice will be supplemented with any new significant facts learned subsequent to its submission. By providing this notice, Zeroed-In does not waive any rights or defenses regarding the applicability of Maine law, the applicability of the Maine data event notification statute, or personal jurisdiction.

**Nature of the Data Event**

On August 8, 2023, Zeroed-In discovered suspicious activity related to certain network systems. Zeroed-In immediately took steps to secure the systems and launched an investigation into the nature and scope of the activity. Through the investigation, it was determined that an unauthorized actor gained access to certain systems between August 7, 2023 and August 8, 2023. While the investigation was able to determine that these systems were accessed, it was not able to confirm all of the specific files that were accessed or taken by the unauthorized actor. Therefore, Zeroed-In conducted a review of the contents of the systems to determine what information was present at the time of the incident, to whom the information relates, and to which Zeroed-In customers the information belonged. This review was completed on August 31, 2023 and Zeroed-In notified Customer of the event because certain individuals associated with them were identified during the review. The information that was present on the systems at the time of the incident includes names, dates of birth, and/or Social Security number. Zeroed-In coordinated notification with Customer and is providing notice to individuals and regulators, as required, on Customer's behalf.

**Notice to Maine Residents**

On or about November 27, 2023, Zeroed-In began providing written notice of this incident to approximately 7,034 Maine residents. Written notice is being provided in substantially the same form as the letter attached here as ***Exhibit A***. Notification to impacted customers and individuals is ongoing, and Zeroed-In may supplement this notification if it is determined that a significant amount of additional Maine residents will receive notice.

**Other Steps Taken and To Be Taken**

Upon discovering the event, Zeroed-In moved quickly to investigate and respond to the incident, assess the security of Zeroed-In systems, and identify potentially affected individuals and Zeroed-In customers. Further, Zeroed-In notified federal law enforcement regarding the event. Zeroed-In is also reviewing existing policies and procedures and implemented additional safeguards. Zeroed-In is also providing complimentary access to credit monitoring services for twelve (12)

months, through TransUnion, to individuals whose information was potentially affected by this incident.

Additionally, Zeroed-In is providing impacted individuals with guidance on how to better protect against identity theft and fraud, including information on how to place a fraud alert and security freeze on one's credit file, the contact details for the national consumer reporting agencies, information on how to obtain a free credit report, a reminder to remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring free credit reports, and encouragement to contact the Federal Trade Commission, their state Attorney General, and law enforcement to report attempted or actual identity theft and fraud. Zeroed-In is providing written notice of this incident to relevant state regulators, as necessary, and to the three major credit reporting agencies, Equifax, Experian, and TransUnion.

# EXHIBIT A

Zeroed-In Technologies, LLC
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

zeroedin

[redacted]

0001010102G0500
P

November x, 2023

**NOTICE OF SECURITY INCIDENT**

Dear [redacted]:

Zeroed-In Technologies, LLC ("Zeroed-In") is writing to notify you of a security incident that involved your information. Zeroed-In is a data and technology consulting firm that provides workforce analytical services to its clients, including [redacted]. As part of these services, Zeroed-In receives information related to applicants and current and former employees of its clients. This letter includes information about Zeroed-In's response to the incident and additional steps you may consider taking.

**What Happened?** On August 8, 2023, Zeroed-In discovered suspicious activity related to certain systems. Zeroed- In immediately took steps to secure the systems and launched an investigation into the nature and scope of the activity. Through the investigation, we determined that an unauthorized actor gained access to certain systems between August 7, 2023, and August 8, 2023. While the investigation was able to determine that these systems were accessed, it was not able to confirm all of the specific files that were accessed or taken by the unauthorized actor. Therefore, Zeroed-In conducted a review of the contents of the systems to determine what information was present at the time of the incident and to whom the information relates.

**What Information Was Involved?** This review was completed on August 31, 2023, and Zeroed-In notified [redacted] of this incident. We are notifying you because the investigation determined that your information was present on the systems involved at the time of the incident and the information includes your name, date of birth, and Social Security number.

**What We Are Doing.** Zeroed-In takes the confidentiality, privacy, and security of information in our care very seriously. Upon discovering the event, we took steps to secure our systems, launched an investigation, and reported this event to federal law enforcement. As part of our ongoing commitment to the security of your information, we are reviewing our existing policies and procedures and implemented additional safeguards to prevent a similar event from occurring in the future. Zeroed-In is also reporting this event to relevant regulators, as required.

Zeroed-In is also offering you access to Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score services at no charge. These services provide you with alerts for twelve (12) months from the date of enrollment when changes occur to your credit file. This notification is sent to you the same day that the change or update takes place with the bureau. Finally, we are providing you with proactive fraud assistance to help with any questions that you might have or in event that you become a victim of fraud. These services will be provided by Cyberscout through Identity Force, a TransUnion company specializing in fraud assistance and remediation services. You must activate these services and instructions to do so can be found in the enclosed *Additional Steps You Can Take.*

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. Please review the enclosed *Additional Steps You Can Take,* which includes further information on additional steps you may

consider taking. Additionally, Zeroed-In encourages you to activate the complimentary credit monitoring being offered.

**For More Information.** Zeroed-In understands you may have questions about this event that are not addressed in this letter. If you have additional questions, please contact our dedicated assistance line 1-833-930-1130 Monday through Friday from 8:00 am to 8:00 pm Eastern time, excluding holidays. You may also write to Zeroed-In at 8595 College Parkway, Suite 350, Fort Myers, FL 33919

We sincerely apologize for any inconvenience this may cause.

Sincerely,

*Zeroed-In Technologies*

Para obtener una versión en carta en español, visite: [redacted]

# ADDITIONAL STEPS YOU CAN TAKE

**Enroll in Monitoring Services**

To enroll in Credit Monitoring services at no charge, please log on to **https://secure.identityforce.com/benefit/zeroedintech** and follow the instructions provided. When prompted please provide the following unique code to receive services: [redacted]

In order for you to receive the monitoring services described above, you must enroll within 90 days from the date of this letter. The enrollment requires an internet connection and e-mail account and may not be available to minors under the age of 18 years of age. Please note that when signing up for monitoring services, you may be asked to verify personal information for your own protection to confirm your identity.

0000102028000 P

**Monitor Your Accounts**

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order a free credit report, visit www.annualcreditreport.com or call, toll- free, 1-877-322-8228. Consumers may also directly contact the three major credit reporting bureaus listed below to request a free copy of their credit report.

Consumers have the right to place an initial or extended "fraud alert" on a credit file at no cost. An initial fraud alert is a 1- year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If consumers are the victim of identity theft, they are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should consumers wish to place a fraud alert, please contact any of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a "credit freeze" on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumer's express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in a consumer's name without consent. However, consumers should be aware that using a credit freeze to take control over who gets access to the personal and financial information in their credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application they make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, consumers cannot be charged to place or lift a credit freeze on their credit report. To request a credit freeze, individuals may need to provide some or all of the following information:

1. Full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. Addresses for the prior two to five years;
5. Proof of current address, such as a current utility bill or telephone bill;
6. A legible photocopy of a government-issued identification card (state driver's license or ID card, etc.); and
7. A copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if they are a victim of identity theft.

Should consumers wish to place a credit freeze or fraud alert, please contact the three major credit reporting bureaus listed below:

| Equifax | Experian | TransUnion |
|---|---|---|
| https://www.equifax.com/personal/credit-report-services/ | https://www.experian.com/help/ | https://www.transunion.com/credit-help |
| 1-888-298-0045 | 1-888-397-3742 | 1-800-916-8800 |
| Equifax Fraud Alert, P.O. Box 105069 Atlanta, GA 30348-5069 | Experian Fraud Alert, P.O. Box 9554, Allen, TX 75013 | TransUnion Fraud Alert, P.O. Box 2000, Chester, PA 19016 |
| Equifax Credit Freeze, P.O. Box 105788 Atlanta, GA 30348-5788 | Experian Credit Freeze, P.O. Box 9554, Allen, TX 75013 | TransUnion Credit Freeze, P.O. Box 160, Woodlyn, PA 19094 |

**Additional Information**

Consumers may further educate themselves regarding identity theft, fraud alerts, credit freezes, and the steps they can take to protect your personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or their state Attorney General.

The Federal Trade Commission may be reached at: 600 Pennsylvania Avenue NW, Washington, D.C. 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. Consumers can obtain further information on how to file such a complaint by way of the contact information listed above. Consumers have the right to file a police report if they ever experience identity theft or fraud. Please note that in order to file a report with law enforcement for identity theft, consumers will likely need to provide some proof that they have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and the relevant state Attorney General. This notice has not been delayed by law enforcement.

*For District of Columbia residents,* the District of Columbia Attorney General may be contacted at: 400 6th Street, NW, Washington, D.C. 20001; 202-727-3400; and oag.dc.gov.

*For Maryland residents,* the Maryland Attorney General may be contacted at: 200 St. Paul Place, 16th Floor, Baltimore, MD 21202; 1-410-576-6300 or 1-888-743-0023; and www.marylandattorneygeneral.gov.

*For New Mexico residents,* consumers have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in their credit file has been used against them, the right to know what is in their credit file, the right to ask for their credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to consumers' files is limited; consumers must give consent for credit reports to be provided to employers; consumers may limit "prescreened" offers of credit and insurance based on information in their credit report; and consumers may seek damages from violators. Consumers may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active-duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage consumers to review their rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights- under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For New York residents,* you may contact and obtain information from these state agencies: New York Department of State Division of Consumer Protection, One Commerce Plaza, 99 Washington Ave., Albany, NY 12231-0001, 518-474-8583 / 1-800-697-1220, http://www.dos.ny.gov/consumerprotection; and New York State Office of the Attorney General, The Capitol, Albany, NY 12224-0341, 1-800-771-7755, https://ag.ny.gov.

*For North Carolina residents,* the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and www.ncdoj.gov.

*For Rhode Island residents,* the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903; www.riag.ri.gov; and 1-401-274-4400. Under Rhode Island law, individuals have the right to obtain any police report filed in regard to this event. There are approximately 7485 Rhode Island residents that may be impacted by this event.